# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

KIFAH MUHAMMADU AL-FUYUDI,   )
                                 )

         Plaintiff,           )
                                 )

v.                             )       Case No. CIV-12-1170-D
                                 )

CORRECTIONS CORPORATION OF   )
AMERICA, INC., et al.,           )
                                 )

         Defendants.       )

## REPORT AND RECOMMENDATION ON
## MOTION FOR SUMMARY JUDGMENT [DOC. NO. 60]

Plaintiff, Kifah Muhammadu Al-Fuyudi, a California state prisoner appearing pro se and in forma pauperis, brings this action pursuant to the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-1 *et seq.*, and 42 U.S.C. § 1983 alleging violations of his federal statutory and constitutional rights during his confinement at North Fork Correctional Facility (NFCF), a private prison located in Sayre, Oklahoma. The matter has been referred by United States District Judge Timothy D. DeGiusti for proposed findings and recommendations consistent with 28 U.S.C. § 636(b)(1)(B) and (C). Pending before the Court is the Motion for Summary Judgment and Brief in Support [Doc. No. 60] of Defendants Corrections Corporation of America (CCA), B. Barton, Sergeant Findlay, L. Lacy and J. Yates (collectively, Defendants). Plaintiff has filed a Response [Doc. No. 72] to Defendants' Motion and the matter is now at issue. The Court has also received the Court-ordered Special Report

[Doc. No. 21].  For the reasons set forth below, it is recommended that judgment be entered in favor of Defendants as to all claims raised in Plaintiff's Complaint.[1]

**FACTUAL BACKGROUND / PLAINTIFF'S CLAIMS**

Plaintiff is a Muslim inmate in the custody of the California Department of Corrections and Rehabilitation (CDCR).  He was assigned to NFCF through a contractual agreement between CDCR and Defendant CCA, the private corporation that owns NFCF.

Plaintiff seeks relief under RLUIPA claiming prison officials at NFCF substantially burdened his religious exercise by:

- failing to provide a proper and nutritionally adequate Halal diet or otherwise interfering with that diet;

- denying Plaintiff the right to wear a kufi at all times; and

- failing to provide religious materials for services, access to Muslim programming on cable television and additional chapel time for services.

Plaintiff also brings claims under 42 U.S.C. § 1983 alleging:

- a violation of his equal protection rights under the Fourteenth Amendment because Christian prisoners are treated more favorably than Muslim prisoners;

- a violation of his Eighth Amendment rights due to unconstitutional conditions of confinement related to the heating of his cell and plumbing problems that caused water to accumulate in his cell and damage his property (books and tapes); and

- a violation of his due process rights under the Fourteenth Amendment for alleged damage to his property (a television, radio and typewriter) which was discovered upon his transfer from La Palma Correctional Facility to NFCF.

---

[1]  In a separate Report and Recommendation filed this same date, the Court recommends dismissal of Plaintiff's claims against the three additional defendants named in this action, Fred Figueroa (former Warden at NFCF), J. Griffin (Assistant Kitchen Food Director) and John Doe (Head of Maintenance).

In addition to compensatory and punitive damages, Plaintiff seeks declaratory and injunctive relief. Specifically Plaintiff requests: "[a] preliminary and permanent injunction ordering defendants Mr. Griffin to stop giving Muslim unhalal food, fake cheese and not providing a balanced meal with small portion. The Muslims would like all of the opposite. Also, by the warden that is here now to allow Muslims to practice our faith by wearing religious, copying religious materials and a Muslim channel. C/C guard L. Lacy and Sergeant Findlay to follow the rules they took an oath to uphold." *See* Complaint at p. 7.[2]

Defendants raise the affirmative defense that Plaintiff has failed to exhaust administrative remedies as to certain claims and, therefore, contend those claims are barred by the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a). Defendants seek summary judgment as to the merits of Plaintiff's remaining claims.

In collectively moving for summary judgment, Defendants have made no effort to distinguish which claims have been asserted against particular defendants. Instead, Defendants treat each of Plaintiff's claims as having been asserted against all defendants. The face of the Complaint and the summary judgment record, however, clearly demonstrate that Plaintiff does not bring all claims against all defendants. Nonetheless, the Court has addressed the arguments in collective fashion as presented by Defendants, but has further identified the respective defendants against whom each claim has been alleged.

## GOVERNING STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, the court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the

---

[2] All references to pleadings and other filings in this action are made to the Court's Electronic Case Filing (ECF) docket entries and pagination. Unless otherwise noted, quotations from the parties' submission are verbatim.

movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). Once a moving party shows it is entitled to judgment as a matter of law, the burden shifts to the nonmoving party to point out the specific facts that create disputed factual issues. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The nonmoving party must present some evidence, other than its initial pleadings, to show that there is more than just a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986); *see also Celotex,* 477 U.S. at 324 (*quoting* Rule 56(e) ("Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by [other evidence] designate 'specific facts showing that there is a genuine issue for trial.'").

To defeat a motion for summary judgment, evidence must be based on more than mere speculation, conjecture or surmise. *Rice v. United States*, 166 F.3d 1088, 1091-1092 (10th Cir. 1999). Moreover, the existence of a factual issue does not preclude entry of summary judgment where there is no evidence to support a dispute on that issue or the evidence is so one-sided that no reasonable juror could find for the other side. *True v. United States*, 190 F.3d 1165, 1177 (10th Cir. 1999). Conclusory allegations will not create a genuine issue of material fact defeating a summary judgment motion. *White v. York Int'l Corp*., 45 F.3d 357, 363 (10th Cir. 1995). In evaluating a motion for summary judgment, a district court must consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences from those facts in favor of that party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

In responding to Defendants' Motion, Plaintiff asserts that "defendants have refused to comply with discovery request[s] and failed to disclose information required by the rules 26(A) Fed. R. Civ. P. 50[.]" *See* Response at p. 1. Plaintiff states that he filed a motion to compel but

that the "rules of the court for discovery purposes ha[ve] impeded plaintiff [sic] opposition to defendants' summary greatly." *See id.* at p. 2. The record reflects that the Court has previously granted, in part, a motion to compel filed by Plaintiff. *See* Order [Doc. No. 75].[3] Moreover, in his Response, Plaintiff fails to identify any particular outstanding discovery or otherwise demonstrate to the Court how any alleged failure by Defendants to comply with discovery has prevented him from responding to their Motion.

The Tenth Circuit, in an unpublished opinion, has recently reiterated the requirements accompanying any request to defer ruling on a summary judgment motion due to issues related to outstanding discovery. *See Handy v. City of Sheridan*, No. 15-1048, -- F. App'x --, 2016 WL 66170 (10th Cir. Jan. 6, 2016). In *Handy*, the court rejected the plaintiff's contention that his outstanding discovery motions should be construed as motions brought pursuant to Rule 56(d), noting that Rule 56(d) requires as affidavit and is a "separate requirement" that serves to ensure a party is invoking the protections of that rule in good faith. *Id.* at *5.[4] The "substantive demands" of Rule 56(d), require the party to demonstrate: "'(1) the probable facts not available, (2) why those facts cannot be presented currently, (3) what steps have been taken to obtain these facts, and (4) how additional time will enable the party to obtain those facts and rebut the motion

---

[3] The Court's Order, filed several months after Plaintiff responded to Defendants' motion for summary judgment, addressed a Motion to Compel [Doc. No. 66] filed by Plaintiff before he responded to the summary judgment motion. The Court ordered Defendants to provide certain information to Plaintiff by August 14, 2015 and granted Plaintiff until August 28, 2015 to file any supplemental response to Defendants' motion for summary judgment. *See* Order [Doc. No. 75] at p. 5. Plaintiff did not, however, file any supplemental response and has not moved for any further relief in this action.

[4] Rule 56(d) requires a nonmovant to show "by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition" and that upon such a showing, the court may "defer considering the motion or deny it," allow additional time for discovery or "issue any other appropriate order." *See* Fed. R. Civ. P. 56(d).

for summary judgment.'" *Id*. (*quoting Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd*., 616 F.3d 1086, 1096 (10th Cir. 2010)). The court further emphasized that the plaintiff's pro se status did not exempt him from these requirements. *Id*. at *4.

Here, Plaintiff has not satisfied the requirements of Rule 56(d). His conclusory assertion that Defendants have refused to comply with discovery requests is insufficient to delay or defer any summary judgment ruling in this action.

## ANALYSIS

**I.    *PLAINTIFF'S TRANSFER FROM NFCF RENDERS MOOT HIS CLAIMS FOR INJUNCTIVE RELIEF***

During the pendency of this action, Plaintiff has filed Notices of Change of Address [Doc. Nos. 37 and 41] which reflect that he is no longer incarcerated at NFCF. Plaintiff has returned to the State of California and is currently incarcerated at California City Facility. *See id*.

Plaintiff's transfer from NFCF renders his claims for injunctive and declaratory relief moot. *See Ind v. Colorado Dept. of Corr.*, 801 F.3d 1209, 1217 (10th Cir. 2015) (holding that RLUIPA claim was moot following prisoner's transfer from administrative segregation); *Green v. Branson*, 108 F.3d 1296, 1300 (10th Cir. 1997) (holding in cases where an inmate plaintiff is released, § 1983 claims for injunctive and declaratory relief mooted because such a judgment "would amount to nothing more than a declaration that he was wronged, and would have no effect on the defendants' behavior towards him") (*citing Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985) (holding prisoner's claims for injunctive and declaratory relief concerning prison conditions were moot where prisoner had been moved to another prison unit); *see also Jordan v. Sosa*, 654 F.3d 1012, 1027-28 (10th Cir. 2011) (where a claim is "penitentiary specific" a prisoner's transfer to another facility may moot the claim).

A narrow capable-of-repetition exception to the mootness doctrine exists. *See McApline v. Thompson*, 187 F.3d 1213, 1216 (10th Cir. 1999). But Plaintiff's claims for declaratory and injunctive relief -- brought against only CCA and individuals employed at NFCF as to conditions at NFCF -- do not fall within the narrow capable-of-repetition exception. *Compare Ind*, 801 F.3d at 1209 (finding moot prisoner's challenge to state's enforcement of two-book policy while in administrative segregation as a violation of his rights under RLUIPA where prisoner was no longer in administrative segregation; court would not assume that prisoner would repeat misconduct that previously sent him to administrative segregation). Indeed, Plaintiff may not ever pass through NFCF again. *See, e.g.. Guion v. Spurlock*, No. 14-CV-00391-LTB-MEH, 2015 WL 394020 at * 11-12 (D. Colo. Jan. 29, 2015) (unpublished op.) (mere theoretical possibility that prisoner would be transferred back to the prison was insufficient to give rise to application of the "capable-of-repetition" exception to the mootness doctrine). Accordingly, Plaintiff's claims for declaratory and injunctive relief should be dismissed as moot. [5]

## II.     *PLAINTIFF'S CLAIMS FOR MONETARY DAMAGES*

The Court now proceeds to address Plaintiff's claims for which he seeks monetary damages. As discussed below:

- Plaintiff's claims regarding his Halal diet (with limited exception) and Plaintiff's property damage claims are not exhausted and must be dismissed.

---

[5] In their Motion, Defendants acknowledge Plaintiff's transfer from NFCF. *See, e.g.,* Defendants' Motion at p. 28 ("Plaintiff is no longer housed at [NFCF]."). Plaintiff transferred from NFCF at least four months prior to the filing of Defendants' Motion. *See* Notice [Doc No. 37]. Inexplicably, Defendants fail to address the effect of Plaintiff's transfer on his claims for injunctive and declaratory relief. However, "mootness is an issue of subject matter jurisdiction," *see Ind*, 801 F.3d at 1213, and, therefore, it can be raised by the Court sua sponte. *See Image Software, Inc. v. Reynolds & Reynolds Co.*, 459 F.3d 1044, 1048 (10th Cir. 2006); *see also Stephens v. Jones*, 494 F. App'x 906, 911 n. 1 (10th Cir. 2012) (it is "entirely permissible" for the Court to address the issue of mootness sua sponte).

- Plaintiff's RLUIPA claims for monetary damages are statutorily barred as to any individual defendant.

- Plaintiff's RLUIPA claims against CCA fail because Plaintiff has not alleged facts to demonstrate his rights have been violated as a result of a policy or custom of CCA or, alternatively, Plaintiff has not demonstrated a substantial burden of his religious exercise.

- Plaintiff's remaining § 1983 claims must be denied because the undisputed factual record demonstrates Defendants are entitled to judgment in their favor as a matter of law.

## A.    *The Exhaustion Requirement*

A prisoner challenging prison conditions must exhaust administrative remedies. *See* 42 U.S.C. § 1997e(a).[6] The exhaustion requirement "allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court" and "improve[s] the quality of suits that are filed by producing a useful administrative record." *Jones v. Bock*, 549 U.S. 199, 204 (2007). Exhaustion is mandatory and an unexhausted claim cannot be brought in court. *Id*. at 211 (*citing Porter v. Nussle*, 534 U.S. 516, 524 (2002)).

Section 1997e(a) requires "proper exhaustion," that is, full compliance with the prison's grievance procedure. *See Woodford v. Ngo*, 548 U.S. 81, 90, 93 (2006). Accordingly, "[a]n inmate who begins the grievance process but does not complete it is barred from pursuing a . . . claim under [the] PLRA for failure to exhaust his administrative remedies." *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002). But inmates are only required to exhaust available administrative remedies. "Where prison officials prevent, thwart, or hinder a prisoner's efforts to

---

[6] As stated, Plaintiff brings claims pursuant to both 42 U.S.C. § 1983 and RLUIPA. The exhaustion requirement extends to claims brought under RLUIPA. *See Cutter v. Wilkinson*, 544 U.S. 709, 723 n. 12 (2005) ("[A] prisoner may not sue under RLUIPA without first exhausting all available administrative remedies.") (*citing* 42 U.S.C. § 2000cc-2(e)).

avail himself of an administrative remedy, they render that remedy 'unavailable' and a court will excuse the prisoner's failure to exhaust." *Little v. Jones*, 607 F.3d 1245, 1250 (10th Cir. 2010).

Exhaustion is an affirmative defense and a defendant bears the burden of proof. *See Jones*, 549 U.S. at 216; *see also Roberts v. Barreras*, 484 F.3d 1236, 1241 (10th Cir. 2007) ("We . . . hold that the burden of proof for the exhaustion of administrative remedies in a suit governed by [42 U.S.C. § 1997e(a)] lies with the defendant."). If Defendants demonstrate the absence of a disputed issue of material fact on the issue of exhaustion, the burden shifts to Plaintiff to "demonstrate with specificity the existence of a disputed material fact" or "show that remedies were unavailable to him as a result of" the actions of prison officials. *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997); *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011).

### *Grievance Procedures Governing Plaintiff's Claims*

Defendants contend that because Plaintiff is a California prisoner, the grievance process for Plaintiff's claims arising at NFCF is governed by California law. *See* Motion at pp. 18-19; *see* also Affidavit of Brandon Barton, Grievance Coordinator at NFCF [Doc. No. 60-2] ("Barton Affidavit"), ¶ 9. Defendants have submitted a copy of the applicable California regulations [Doc. No. 60-3] in support of their motion for summary judgment. Plaintiff does not challenge the applicability of California law.

The CDCR's grievance system allows a prisoner to appeal any departmental decision, action, condition, or policy having an adverse effect on a prisoner's welfare. Cal. Code Regs. tit. 15, § 3084.1. California prisoners must proceed through three levels of appeal to exhaust administrative remedies: (1) formal written appeal on a CDC 602 inmate appeal form, (Form 602); (2) second level appeal to the institution head or designee; and (3) third level appeal to the Secretary of the California Department of Corrections and Rehabilitation ("CDCR"). Cal. Code

Regs. tit. 15, § 3084.7; *see also* Barton Affidavit, ¶ 10.[7] The third level of review constitutes the decision of the Secretary of the CDCR and exhausts a prisoner's administrative remedies. *See id*. § 3084.7(d)(3); *see also* Barton Affidavit, ¶ 10. A California prisoner is required to submit an inmate appeal at the appropriate level and proceed to the highest level of review available to him. *See, e.g., Butler v. Adams*, 397 F.3d 1181, 1183 (9th Cir. 2005).

In addition to the above procedures, the regulations allow an inmate to utilize a Form 22 to attempt to resolve informally a grievance "with staff and/or to request items and services." Cal.Code Regs, tit., 15 § 3086(d)(1). A Form 22 is intended to facilitate the "timely resolution of routine matters through an effective and non-conflictive communication process," pursuant to which "Department staff shall attempt to resolve inmate and parolee issues expeditiously." *Id*. § 3086(a). However, an inmate's submission of a Form 22 does not stay the thirty-day deadline for initiating a Form 602 appeal and does not constitute exhaustion of administrative remedies. *Id*. § 3086(e)(2) and (i).

### *Plaintiff's Efforts To Exhaust Administrative Remedies*

Defendants submit a rather voluminous exhaustion record and address in detail the grievance record as to claims they concede are exhausted. Defendants also submit grievances on matters wholly unrelated to the claims at issue in this lawsuit. But parsed to its essentials, the exhaustion defense is raised only as to two claims: (1) Plaintiff's RLUIPA claims concerning the prison's supply of halal meat, halal meat improperly given to inmates not approved for such a diet, halal meals served late and the nutritional adequacy of halal meals; and (2) Plaintiff's claim

---

[7] Each of the three levels of formal review is referred to as an "appeal."

that he was deprived of property without due process of law due to the alleged damage to his television, radio and typewriter.[8]

---

[8] The Court uses the following chart to assist in identifying the claims brought by Plaintiff, the corresponding grievances with respect to these claims, and Defendants position as to whether Plaintiff has exhausted administrative remedies under 42 U.S.C. § 1997e(a):

| PLAINTIFF'S CLAIM | GRIEVANCE NO. | EXHAUSTED? |
| --- | --- | --- |
| RLUIPA claims challenging Halal meal on November 30, 2011 with beans as protein source; Halal portion sizes; condiments | NF-12-11-004 | YES |
| RLUIPA claims and § 1983 claims challenging Fourteenth Amendment violations related to: <br><br> • Permission to wear kufi at all times <br> • Copies of religious materials/ funds for religious items <br> • Muslim television channel <br> • More days in chapel for Muslim services | NF-11-05-001 | YES |
| RLUIPA claims challenging: <br><br> • Adequate supply of halal meat <br> • Halal meat improperly provided to inmates not approved for halal diet <br> • Halal meals served late <br> • nutritional adequacy of halal meals | NF-11-09-002 | NO |
| § 1983 claim alleging Eighth Amendment violation: <br><br> • inadequate heating in cell <br> • denial of additional clothing | NF-01-12-005 | YES |
| § 1983 claim alleging Eighth Amendment violation: <br><br> • water in cell due to plumbing issues <br> • resulting property damage | NF-02-12-005 | YES |
| § 1983 claim alleging Fourteenth Amendment violation for deprivation of property without due process | Plaintiff told to submit grievance to La Palma Correctional Facility | NO |

### 1. Halal Diet Claims

Defendants contend Plaintiff has not exhausted administrative remedies as to any claims related to the halal diet other than those contained in Grievance No. NF-12-11-004. Although Plaintiff attempted to seek informal resolution of additional matters concerning the halal diet through submission of various Form 22s, he did not complete the formal grievance through all three levels of appeal.

Brandon Barton was a CCA employee and worked as the Grievance Coordinator at NFCF during the period of time relevant to Plaintiff's claims. *See* Barton Affidavit, ¶ 2. As to Plaintiff's utilization of the grievance process for issues related to his halal diet, Mr. Barton states that Plaintiff submitted two Form 22s (dated July 28, 2011 and August 8 2011) and received responses to each of those submissions. *See* Barton Affidavit, ¶ 13; *see also*, Grievance Record [Doc. No. 60-4] at p. 19. Mr. Barton further states that Plaintiff submitted a Form 602 (dated September 12, 2011) and received a response from Defendant Griffin. *See* Barton Affidavit, ¶ 14; *see also* Grievance Record [Doc. No. 60-4] at pp. 17-18. But Plaintiff did not complete the grievance process by seeking Second or Third Level Review. *See* Barton Affidavit, ¶ 14. Because Plaintiff did not complete the grievance process, his claims are unexhausted. *See Jernigan*, 304 F.3d at 1032.[9]

In response, Plaintiff states in wholly conclusory fashion, that he exhausted all claims in this lawsuit. *See* Response at p. 5 "Disputed Facts," ¶ 1. Alternatively, Plaintiff states that "Defendants didn't follow their own policy" and, therefore, he could not properly exhaust his claims. *See id.*, ¶¶ 4-5 (*citing* Exhibit A4). But Plaintiff's attached exhibit is nothing more than

---

[9] Defendant Barton identifies another Form 22 submitted by Plaintiff on November 6, 2011. *See* Barton Affidavit, ¶ 15. The record does not demonstrate any formal grievance followed.

a set of instructions about how to submit Form 22s. *See* Response, Exhibit A4 [Doc. No. 72-4]. Plaintiff submits no facts to demonstrate how Defendants failed to follow the grievance policy. Nor does Plaintiff support his allegations with any specificity, such as identifying any grievances to which he did not receive proper responses, dates of submission, or responsible individuals.

Plaintiff further alleges that Defendant Barton "continued to play with the appeal system and deny 602 appeals." *See* Plaintiff's Response at p. 6, ¶ 10. But Plaintiff relies only an a declaration of "Bolivta," a guard on the night shift, who states "inmate Muhammad showed me that appeal coordinator B. Barton keep screening them out after everything was done right. This happened a couple of times and I am aware of this because I passed the mail out to inmate Muhammad." *See* Declaration of Bolivta [Doc. No. 72-1] (Bolivta Declaration). Even if the Court were to deem the Bolivta Declaration evidence sufficient for consideration on the present summary judgment record, the statement by Bolivta is wholly conclusory and insufficient to show that Plaintiff was thwarted by prison officials from properly exhausting his claims.

Additionally, as stated in the Barton Affidavit, Plaintiff had a remedy under the CDCR grievance procedures to address any alleged misconduct by Defendant Barton. *See* Barton Affidavit, ¶ 26; *see also* Cal. Code Regs. tit. 15, §§ 3084.5(b)(4), 3084.9(i)(1) (addressing process for appeals alleging staff misconduct); California Out-of-State Correctional Facility Operational Procedures [Doc. No. 21-4] at p. 9 (addressing staff complaints). Finally, Plaintiff's grievance submissions belie Plaintiff's claims that prison officials prevented him from properly exhausting his administrative remedies. Plaintiff completed the grievance process as to many issues, including the majority of claims raised in this lawsuit. For all these reasons, the Court finds Defendants are entitled to judgment as a matter of law in their favor as to Plaintiff's claims relating to the Halal diet provided to him at NFCF, except any claims addressed in Grievance

No. NF-12-11-004.[10]  As set forth, Defendants concede the latter claims are exhausted.  *See* footnote 8, *supra*; *see also* Defendants' Motion at p. 26.

## 2.    Property Damage Claims

The summary judgment record shows that Plaintiff was previously confined at La Palma Correctional Facility (La Palma) and transferred from that facility to NFCF.  Upon his arrival at NFCF, Defendant Lacy, the property officer, completed an Incident Statement, *see* [Doc. No. 60-14] at p. 2, and reported Plaintiff's television was broken.  On that same date, April 5, 2011, Defendants Lacy and Findlay completed an inventory of Plaintiff's incoming property and that inventory reflects that Plaintiff's radio and typewriter were also broken.  *See* Allowable Personal Property Inventory/ Receipt [Doc. No. 60-14] at p. 3.

Plaintiff submitted a grievance and on April 19, 2011, R. Williams, who appears to be the grievance coordinator at La Palma, advised Plaintiff that he needed to submit his claim on a Form 602 and attach purchase receipts and the property inventories conducted at both La Palma and NFCF.  *See* La Palma Grievance Records [Doc. No. 60-8] at p. 7.  On June 9, 2011, Plaintiff submitted the Form 602.  As the requested action Plaintiff stated: "I am requesting *for my t.v. to be paid for* and the money to be placed on my books."  *See id*. at p. 4 (emphasis added).  Plaintiff did not request any action be taken with respect to his radio and typewriter.

On June 20, 2011, R. Williams rejected Plaintiff's grievance.  He advised Plaintiff that he must resubmit the grievance on a Form 602 and "[p]rovide property inventory from NFCF, purchase receipt for TV and radio and 5-1C statement from issuing facility.  Return to [La

---

[10]  In responding to Defendants' motion, Plaintiff states that "[s]taff continued to play around with the halal meals my making the trays short of food or put unhalal meat on the trays."  *See* Response at p. 5, Disputed Facts, ¶ 6.  In support, he attaches several Form 22s he submitted related to this issue and covering a range of time.  Again, however, the record does not demonstrate any formal grievances followed.

Palma] Grievance Dept. -- 5501 N. La Palma Road, Eloy, AZ 85131." *Id.* at p. 3. Plaintiff was also instructed that he had thirty calendar days within which to resubmit the grievance. *Id.*

Plaintiff did not resubmit the Form 602 within the required thirty days. Instead, he waited until November 21, 2011 -- five months later -- to submit the requested documents. *See* Appeal Screening Form [Doc. No. 60-8] at p. 2. On this ground, his grievance was "cancelled." *See id.*

The record demonstrates that Plaintiff did not exhaust administrative remedies as to any claim alleging damage to his radio and typewriter. In the only grievance submitted by Plaintiff, he requested solely that he be compensated for his television. As to that grievance, Plaintiff did not properly follow the grievance procedure and, therefore, that claim is also unexhausted.

In responding to Defendants' Motion, Plaintiff does not refute any of the facts set forth above. Instead, Plaintiff submits his own declaration and focuses on efforts to address this claim at NFCF. *See* Plaintiff's Declaration [Doc. No. 72-9]. Without any evidentiary support, he contends that Defendant Findlay and correctional officer Howell (not a named Defendant in this action) told Plaintiff that his property issue would be "taken care of" and his property replaced. *See id.* He states that after a few weeks passed he did not obtain any relief and so he submitted a Form 602 on May 18, 2011. *Id.* According to Plaintiff, Defendant Barton would not process his grievance. *Id.* He also claims he submitted several Form 22 requests to Defendants Lindlay and Lacy and they would not process those forms. He does not attach any evidentiary support for these allegations. [11]

---

[11] The record, however, includes two grievances related to this issue that Plaintiff submitted in May and June 2011 at NFCF that were either cancelled or rejected by NFCF. *See* Grievance Record [Doc. No. 60-4] at pp. 9, 10-14. Plaintiff was told he must address the issue at La Palma. *See id.* It appears Plaintiff was requesting copies of property receipts to assist in the grievance of . . . cont'd . . .

Plaintiff does attach, however, two Form 22s submitted at NFCF in September 2011 -- two months after the expiration of the thirty-day period within which Plaintiff had been instructed to resubmit the Form 602 to La Palma. *See* Form 22s [Doc. No. 72-2] at pp. 1, 2. On September 15, 2011, Mr. McNair responded "still trying to find items to replace broken items." *See id.* Plaintiff submitted a second Form 22 on September 13, 2011 about the same issue. *See* Form 22 [Doc. No. 72-2]. On September 21, 2011, R. McNair responded: "You were given a tv by CC Beard. You were told that as soon as we find items that could replace your radio & typewriter you will receive them. Please do not write any more [Form] 22s until we find items to replace the radio & typewriter. We will keep you updated." *Id.* No further submissions regarding the exhaustion of administrative remedies at NFCF exist in the summary judgment record. Thus, while Plaintiff may have filed Form 22s, there is no evidence that he filed any Form 602s or otherwise invoked the appeals process.

The statements contained in Plaintiff's Declaration are insufficient to withstand summary judgment on grounds he did not properly exhaust administrative remedies. His statements are nothing more than conclusory assertions not supported by any evidence. The evidentiary record demonstrates that Plaintiff was instructed to pursue administrative remedies at La Palma, that he received assistance from prison officials in pursuing relief in this manner, that he, in fact, pursued such relief by submitting a Form 602 to R. Williams, the grievance coordinator at La Palma, and that despite being given the opportunity to cure deficiencies with respect to his grievance, he failed to timely do so. It is not enough that Plaintiff initiated the grievance

---

the property damage issue. But there is no indication that the cancellation or rejection of the grievances caused the excessive five-month delay accompanying Plaintiff's resubmission of the grievance at La Palma.

procedure. He was required to complete all phases of the grievance procedure. The Court, therefore, concludes that Plaintiff failed to exhaust administrative remedies.[12]

In sum, the Court finds Defendants' affirmative defense of failure to exhaust administrative remedies is established as a matter of law. Defendants are entitled to summary judgment as to any claims based on the religious diet provided to Plaintiff at NFCF, other than those claims related to Grievance No. NF-12-11-004. Defendants are further entitled to summary judgment with respect to Plaintiff's due process claims based on alleged damage to his television, radio and typewriter.[13]

The Court now addresses Plaintiff's remaining claims as to which no exhaustion defense has been raised.

## B.     RLUIPA Claims

Under RLUIPA:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person --

(1) is in furtherance of a compelling governmental interest; and

---

[12] Defendants have submitted additional evidence regarding an Incident Statement [Doc. No. 21-5] dated March 23, 2013 -- two years after the alleged damage to his property upon arrival at NFCF. That Incident Statement and the Affidavit of Stephanie Thurmond [Doc. Nos. 21-6; 60-15] demonstrate that employees at NFCF later replaced Plaintiff's television and radio though no particular date is provided. But Plaintiff persisted in seeking compensation for damage to his typewriter. *See* Incident Statement; *see also* Thurmond Affidavit, ¶¶ 1-6. Defendants do not articulate the significance of this additional evidence and the Court finds this additional evidence is not material to the exhaustion defense.

[13] Notwithstanding Plaintiff's failure to exhaust his due process claims, Defendants alternatively move for summary judgment on the merits of that claim and, therefore, the Court has also addressed the merits. *See* discussion, *infra*.

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1.

### 1. Defendants Have Failed to Adequately Brief Whether RLUIPA Applies to Private Prisons

As an initial matter, Defendants claim they are entitled to judgment as a matter of law in their favor on Plaintiff's RLUIPA claims because RLUIPA does not apply to a private prison. According to Defendants, a private prison does not fall within RLUIPA's statutory definition of "government." *See* Defendants' Motion at p. 28 ("RLUIPA cannot be construed as creating a cause of action against any individual, non-governmental, Defendant."). In support, Defendants rely solely on an unpublished decision of the Tenth Circuit Court of Appeals construing the Americans with Disabilities Act (ADA) and holding that under the ADA, a private prison is not an "instrumentality" of the state. *See id.* (*citing Phillips v. Tiona*, 508 F. App'x 737, 750 (10th Cir. 2013)).[14] Defendants otherwise make no effort to further develop this argument; they do not address relevant statutory provisions of RLUIPA or any case law addressing whether RLUIPA (as opposed to the ADA) applies to private prisons.

The Tenth Circuit, without expressly addressing the issue, has allowed a RLUIPA claim to proceed against a private prison. *See, e.g., Abdulhaseeb v. Calbone*, 600 F.3d 1301 (10th Cir. 2010). Indeed, in *Phillips*, the case relied upon by Defendants to argue RLUIPA does not apply to a private prison, the Tenth Circuit noted: "several courts have held that under [RLUIPA] private prisons qualify as 'instrumentalities' of state government" but further noted that "[t]hese

---

[14] RLUIPA similarly uses the term "instrumentality" in its definition of "government." *See* 42 U.S.C. § 2000cc–5(4) (defining "government" as "(i) a State, county, municipality, or other governmental entity created under the authority of a State; (ii) any branch, department, agency, instrumentality or official of an entity listed in clause (i); and (iii) any other person acting under color of State law.").

lines of reasoning are not without exceptions" *Id.*, 508 F. App'x at 750. Several other courts have similarly allowed prisoners to bring RLUIPA claims against private prisons. *See, e.g., Knows His Gun v. Montana*, 866 F. Supp.2d 1235, 1246-47 (D. Mont. 2012) (collecting cases); *see also Dean v. Corr. Corp. of America*, 540 F. Supp. 2d 691, 693-95 (N. D. Miss. 2008) (CCA acted as instrumentality of the Hawaii Department of Public Safety, a recipient of federal financial assistance and, therefore, RLUIPA claim could be brought against it). Given this authority and Defendants' failure to adequately develop their statutory construction claim, the Court finds Defendants' argument should be rejected.

### 2. No Individual Liability for Money Damages Exists Under RLUIPA

But another issue exists with respect to the viability of Plaintiff's RLUIPA claims and, although not raised by Defendants, the Court has a duty to address the issue. *See* 28 U.S.C. §§ 1915(e); 1915A; *see also* Fed. R. Civ. P. 56(f). As set forth above, Plaintiff's claims for injunctive relief are moot leaving only his claims for monetary damages. Any claim for monetary damages must fail as to the individual defendants. *See Stewart v. Beach*, 701 F.3d 1322, 1334 (10th Cir. 2012) (holding that "there is no cause of action under RLUIPA for individual capacity claims").

In *Stewart*, the Tenth Circuit addressed RLUIPA's definition of government for purposes of deciding whether a prisoner could state a RLUIPA claim against state correctional officers sued in their individual capacities. The court observed that "[f]our circuits have held that, despite defining the term 'government' to include 'any other person acting under color of State law,' RLUIPA does not provide a cause of action against individual defendants in their individual capacities." *Id*. at 1334 (citing cases from the Third, Fifth, Seventh and Eleventh circuits); *see also Wood v. Yordy*, 753 F.3d 899, 902-04 (9th Cir. 2014) (*accord*; framing issue as

whether allowing a RLUIPA action "against individuals who do not receive any federal money would reach beyond the scope of Congress's constitutional authority [under the Spending Clause].").  The Tenth Circuit agreed with the 'focus" those circuit decisions placed on "the fact that Congress enacted RLUIPA pursuant to the Spending Clause of the Constitution" and their ultimate conclusion that Spending Clause legislation "operates like a contract, and individual RLUIPA defendants are not parties to the contract in their individual capacities."  *Stewart*, 701 F.3d at 1334 (citation omitted).  Instead, only the state, as the grant recipient, can be liable for a RLUIPA violation.  *Id.*[15]  Based on *Stewart*, Plaintiff's claims against the individual defendants for money damages fail as a matter of law.

### 3. RLUIPA Claims for Monetary Damages Against CCA

Whether a RLUIPA claim for monetary damages exists against Defendant CCA, a private corporation, appears to be an open and potentially complex question.  Unlike individual defendants, as addressed in *Stewart*, CCA may be deemed a "party to the contract" for Spending Clause purposes.  *See, e.g, Giron v. Corr. Corp. of Am.*, 14 F.Supp.2d 1245, 1249-51 (D. N.M. 1998) (recognizing -- for purposes of § 1983 -- that a private prison serves a public function delegated to it by the state and is thus a state actor as to the performance of that function); *cf Phillips*, 508 F. App'x at 751 ("[f]unctionally, private prisons . . . only partly mirror prisons operated by the state.").[16]

---

[15] Eleventh Amendment immunity protects a State from liability for monetary damages under RLUIPA.  *Sossamon v. Texas*, -- U.S. --, 131 S.Ct. 1651, 1658-59 (2011) (finding that RLUIPA only supports a claim for prospective injunctive relief against state actors in their official capacities).  No state or state officer is a defendant in this action.

[16] The record does not reflect whether the CDCR receives federal funding, but it appears that all states receive such funding.  *See Cutter*, 544 U.S. at 716, n. 4 (2005).

Courts have allowed RLUIPA claims for money damages against private correctional facilities but in those cases no specific challenge to such relief was presented. *See, e.g., Knows His Gun*, 866 F. Supp. 2d at 1248 (permitting plaintiff to pursue claim for monetary damages against private correctional facility defendants);[17] *Dean*, 540 F. Supp.2d at 695 (same; awarding nominal damages).[18]

Assuming a RLUIPA claim for monetary damages is viable against CCA, nonetheless, CCA is entitled to judgment as a matter of law in its favor. Plaintiff does not identify any policy or custom promulgated by CCA that has resulted in a violation of his rights under RLUIPA. Under Tenth Circuit law, a private corporation's liability under § 1983, is governed by the same standards applicable to a municipality. *See, e.g., Smedley v. Corrections Corp. of Am*, 175 F. App'x 943, 945-46 (10th Cir. 2005) (applying doctrine of *Monnell*[19] to determine liability of a private corrections facility under well-established law) (*citing Dubbs v. Head Start, Inc*., 336 F.3d 1194, 1216 (10th Cir. 2003)). And, it appears these same standards would extend to

---

[17] In *Knows His Gun*, no distinction was drawn by the court between the corporate defendant and the individual employees of the corporation in allowing a RLUIPA claim for money damages to proceed. Subsequent to the court's decision, the Ninth Circuit, like the Tenth Circuit has held that no individual liability exists under RLUIPA. *See Wood*, 753 F.3d at 902-04.

[18] And, addressing a related issue, at least one circuit court of appeals has found that municipalities and counties may be held liable for money damages under RLUIPA. *See Centro Familiar Cristiano Buenas Nuevas v. City of Yuma*, 651 F.3d 1163, 1168-69 (9th Cir. 2011) (noting that in *Sossamon*, the Supreme Court held that "states may not be held liable for monetary damages under RLUIPA because they have not waived sovereign immunity" but that "[t]he Eleventh Amendment requirement does not apply to municipalities.").

[19] *See Monnell v. Dep't of Social Servs. of New York*, 436 U.S. 658 (1978). In *Monnell*, the Supreme Court held that under § 1983, a municipality cannot be held liable for the acts of its agents; instead, it must be shown that the municipality caused the constitutional violation by instituting an official policy or custom that was the direct cause or "moving force" behind the constitutional violations. *Id*. at 690.

Plaintiff's RLUIPA claims. *See, e.g Ciempa v. Jones*, 745 F. Supp.2d 1171, 1200 (N.D. Okla. 2010) (finding "logic" of § 1983's personal participation requirement applicable to RLUIPA); *Lowery v. Edmondson*, 528 F. App'x 789, 792 (10th Cir. 2013) (affirming dismissal of prisoner's RLUIPA claim alleging defendants did not allow prisoner to keep fez in his cell or wear it for religious purposes: "[t]o the extent Mr. Lowery sought to challenge a prison policy, he had the burden to name and explain the various defendants' involvement, if only as policymakers"); *cf Alamiin v. Beasley*, No. 06-871-F, 2011 WL 2636538 at *3 n. 5 (W.D. Okla. 2011) (noting that private prison corporation did not address whether it was amenable to suit under RLUIPA and, if so, "whether either the doctrine of respondeat superior or the *Monnell* test should be used to determine a private corporations' liability under RLUIPA").

Plaintiff's Complaint fails to identify any policy or custom *promulgated by CCA* that has resulted in the violation of his rights. Moreover, as discussed more fully below, the summary judgment record contains no facts demonstrating that Plaintiff's rights have been violated as a result of any policy or custom of CCA. Accordingly, CCA is further entitled to judgment as a matter of law in its favor as to Plaintiff's RLUIPA claims brought against it.

### 4. Plaintiff Has Not Shown a Substantial Burden on his Religious Exercise

Alternatively, as urged by Defendants in moving for summary judgment, Plaintiff has failed to meet his burden of establishing Defendants have substantially burdened his religious exercise. Accordingly, Plaintiff's RLUIPA claims fail.

Although RLUIPA protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," nonetheless "a prisoner's request for an accommodation must be based on a religious belief and not some other motivation." *Holt v. Hobbs*, -- U.S. --, 135 S.Ct. 853, 862 (2015) (internal quotations omitted). The requirement that a religious

practice be sincerely held is a fairly easy threshold to meet.  *See, e.g., Kay v Bemis*, 500 F.3d 1214, 1220 (10th Cir. 2007) ("Sincerely held is different from central, and courts have rightly shied away from attempting to gauge how central a sincerely held belief is to the believer's religion.") (citation omitted); *see also Yellowbear v. Lampert*, 741 F.3d 48, 54 (10th Cir. 2014) ("When inquiring into a claimant's *sincerity*,[the court's] task is . . . a more modest one, limited to asking whether the claimant is (in essence) seeking to perpetrate a fraud on the court -- whether he actually holds the beliefs he claims to hold -- a comparatively familiar task for secular courts that are regularly called on to make credibility assessments -- and an important task, too, for ensuring the integrity of any judicial proceeding.").

In moving for summary judgment, Defendants do not challenge that Plaintiff's halal diet, request to wear a kufi, or his other religious practices are not based on a religious belief.  Thus, the Court assumes, without deciding, that Plaintiff has satisfied this first element on which he bears the burden of proof.

The dispositive issue instead turns on the second element on which Plaintiff bears the burden of proof – whether Defendants' actions have substantially burdened Plaintiff's religious exercise. The substantial burden inquiry focuses on "the coercive impact of the government's actions."  *Yellowbear*, 741 F.3d at 55.  A burden is substantial when the government "(1) requires the plaintiff to participate in an activity prohibited by a sincerely held religious belief, (2) prevents the plaintiff from participating in an activity motivated by a sincerely held religious belief, or (3) places considerable pressure on the plaintiff to violate a sincerely held religious belief -- for example, by presenting an illusory or Hobson's choice where the only realistically possible course of action available to the plaintiff trenches on sincere religious exercise."  *Id.*

As pertinent to Plaintiff's RLUIPA claims, the following facts are undisputed: (1) NFCF has a religious meal program for inmates; (2) Plaintiff, as a practicing Muslim, was approved for and received the halal diet; (3) Plaintiff was allowed to wear a kufi in the chapel during services; (4) the warden at NFCF did not approve the wearing of a kufi at any other times; (5) Muslims were allowed to use the chapel at NFCF two times per week for religious services; (6) prison officials did not always provide free copies of religious materials for Muslim services; and (8) no Muslim programs were available through NFCF's cable television package.

### a.    Halal Diet Claims (Defendants CCA and Yates)

Plaintiff's only exhausted RLUIPA claim challenging the halal diet at NFCF is based on conclusory allegations of sporadic instances of alleged unsatisfactory food.  Plaintiff alleges that at times the halal portions are inadequate, the portion sizes are too small and/or the halal trays do not contain the same condiments as regular trays.

Grievance No. NF-12-11-004 identifies the claim as follows: "The appellant is submitting this appeal relative to the halal meal on 11/30/11 having beans in it as a protein source, the allegation that the portion size is too small, and halal meals do not contain the same condiments as regular trays."  *Id.* [Doc. No. 60-5] at pp. 18-24, 19.  The First Level Response provides:

> NFCF is already in compliance with the requested action.  All menus are reviewed by a registered dietician before they are approved and implemented to meet or exceed the daily caloric requirements set out in Title 15.  All serving utensils are standardized and staff members oversee the preparation of trays.  The halal meal served on 11/30/11 showed no alternative required by the dietician however this was in error due to a reorganization of the menu to serve halal alternatives at lunch rather than dinner.  The error has been addressed and corrected moving forward.

*Id.* at p. 26.  The appeal was partially granted based on the acknowledged error.  The First Level Response was approved at both the Second Level and Third Level.  *See* Grievance Records [Doc. No. 60-7] at pp. 20-21, 28-29.

In his Response, Plaintiff notes the prison's policy that prisoners receiving the Halal diet only receive meat at night; if the "main [food] line" receives meat at breakfast or lunch, those receiving a Halal meal diet are to receive peanut butter and jelly or cheese and that "[t]he meals are suppose[d] to be the same except for the meat." *See* Plaintiff's Response at p. 4. He does not challenge this policy and otherwise, Plaintiff does not specifically address the factual matters which serve as the basis for his claim. Instead, Plaintiff relies on the Bolivta Declaration. With respect to the halal diet, Bolivta states: "On many occasions the food was brought after the main line ate. The things they were getting was very short than the regular trays. At times their lunch consists of bread, a ready pack of grits, fruit and cookies." *Id*. The Declaration is wholly conclusory and fails to identify any dates or otherwise provide any specific context for Plaintiff's claims.

Plaintiff also attaches the affidavits of Muslim prisoners at NFCF. In conclusory fashion, these affidavits state that at NFCF, halal meals are served late, contain smaller portions than regular trays, are served cold, are otherwise "subpar" and often contain "fake cheese." *See* Affidavits [Doc. No. 72-8] at pp. 1-5.[20] None of the affidavits provide any specific factual allegations, identify the prison official responsible for the alleged conduct or provide dates or even a general reference to the time period during which this conduct occurred.

Additionally, Plaintiff attaches several Form 22s submitted with respect to complaints about the halal diet. *See* Form 22s [Doc. No. 72-5]. Six of those Form 22s relate to the time period June 1, 2012 through June 12, 2012. The other Form 22s involve issues occurring on

_____

[20] To the extent the affidavits contain statements regarding incidents specific to the particular prisoner and unrelated to Plaintiff's claims, those statements have been disregarded as immaterial. *See, e.g*., Affidavit of Jeffrey Gray [Doc. No. 72-8] (stating that at some unspecified time, Mr. Gray was "moved to another building" and did not receive his halal diet for three weeks).

November 6, 2011, September 12, 2012, January 23, 2013 and February 3, 2013. There is no record of any grievance filed as to any of these Form 22s and as previously addressed, any claims related thereto are, therefore, unexhausted.

In *Abdulhaseeb*, a Muslim prisoner claimed his halal food tray had been contaminated because it included jello and pudding. The Court held that not "every single presentation of a meal an inmate considers impermissible constitutes a substantial burden on an inmate's religious exercise." *Id.*, 600 F.3d at 1321. Because the record included only one *specific* incident of an unacceptable meal, and otherwise, the prisoner submitted only general conclusory allegations that the offending practice continued, the prisoner failed to meet his burden of establishing prison officials had substantially burdened his religious exercise. *Id.* In reaching this conclusion, however, the court "assume[d] that as the frequency of presenting unacceptable food increases, at some point the situation would rise to the level of a substantial burden." *Id.*

In a subsequent unpublished decision, *Strope v. Cummings*, 381 F. App'x 878, 881-882 (10th Cir. 2010), the Tenth Circuit addressed once again the adequacy of a religious diet provided to a prisoner. In *Strope*, the court identified seven specific instances "gleaned from [the prisoner's] pleadings and grievances" related to the adequacy of his kosher diet. Those alleged inadequacies are closely akin to the claims made by Plaintiff in this action.[21] The court found

---

[21] The court described the inadequacies as follows:

> Much of [Mr. Strope's] objection to the diet has been advanced in general terms: kosher meals were less varied than the regular meals, had a paucity of seasonal fruits and vegetables, included wilted or even rotten items on occasion, and entirely lacked certain items found on the regular menu. The specific instances gleaned from his pleadings and grievances cited therein are: (1) on June 27, Strope received a warm sandwich (that should have been 'cool/crisp'), along with a 'green orange' and a 'nasty' carrot/cabbage salad; (2) on June 30, he was served salad dressing that was not kosher; and (3) lunch on July 16 included a salad that

. . . cont'd . . .

that Mr. Strope's complaints "reflect the inconvenience of non-preferred or occasionally unsatisfactory items in a meal" that did not substantially burden his "practice of maintaining a kosher diet." *Id*. at 882. Recognizing that the case involved more instances than those at issue in *Abdulhaseeb*, the Court nonetheless found that "none were shown to have completely denied an edible meal to the prisoner," and therefore, the burden was "lighter" than that found to be insubstantial in *Abdulhaseeb*." *Id*. And as to Mr. Strope's "broader complaint about the variety, quality, and rotation of the menu, such general allegations are insufficient at the summary judgment stage" but were merely unsupported, conclusory allegations that failed to raise a genuine issue of material fact. *Id*.

As in *Strope*, Plaintiff specifically identifies only sporadic instances of unacceptable food and otherwise makes wholly conclusory allegations as to the quality and variety of the meals. No facts demonstrate that Plaintiff has been completely denied an edible meal.[22] On the factual

---

was 'rotted and clearly smelled spoiled.' Grievances attached to but not cited in the complaint add: (4) on July 4, the regular line had a holiday meal with ice cream but the kosher line did not, even though the ice cream was kosher (the prison explained that the ice cream could not be given to the kosher line, which already was being served meat and therefore could not be served a dairy product); (5) a July 10 grievance over the lack of meal rotation complained of two consecutive chicken suppers and three rice/soy bean meals in the last several days (the prison noted that the former were different chicken dishes and the latter included soy chili and red beans and rice dishes); (6) on July 11, he was served a 'cold tray' that was warm with wilted carrot sticks, id. at 81; and (7) on July 14, he received a turkey sandwich and rotted orange, while the regular line had a full balanced tray with macaroni salad.

*Id*. at 880-81 (citations omitted).

[22] To the extent the prison officials acknowledge an error was made with respect to the meal served on November 30, 2011, i.e. that Halal alternatives were served at lunch rather than dinner, they corrected that error. There is no evidence in the record that the error resulted from any intentional conduct toward Plaintiff. Instead, the record demonstrates, at best, negligent conduct not actionable under RLUIPA. *Compare Gallagher v. Shelton*, 587 F.3d 1063, 1070 (addressing . . . cont'd . . .

record presented, Plaintiff fails to present a triable issue of fact that Defendants have substantially burdened his religious exercise.[23]  Defendants, therefore, are entitled to judgment as a matter of law in their favor.

### b.    Religious Clothing / Kufi (Defendants CCA and Yates)

In his Complaint Plaintiff alleges that "Muslims were not allowed to . . . wear our religious kufi hats except in chapel."  *See* Complaint at p. 4.  Plaintiff claims his religious exercise rights have been violated because he is not allowed to wear a kufi *at all times*.

Plaintiff brings this claim against Defendants CCA and Yates.  Plaintiff alleges that Defendant Yates told the chaplain at NFCF that Plaintiff could only where a Kufi in the chapel. *See* Complaint at p. 4.  In responding to Defendants' Motion, Plaintiff again states that Defendant Yates did not allow Muslims to wear their religious gear outside the chapel and he attaches the grievance records related to this issue.  *See* Response at p. 6, Disputed Facts, ¶ 14; *see also* Grievance Records [Doc. No. 72-11].

Plaintiff's only allegation against Defendant CCA is that, as the parent company of NFCF, CCA was "aware" of all the things going on there and did nothing to correct any of the problems.  *See* Response at p. 5, Disputed Facts, ¶ 3.  As support, he attaches his own "to whom

---

substantial burden requirement under First Amendment and finding that isolated acts of negligence are insufficient and a plaintiff must allege "'conscious or intentional interference with his free exercise rights'") (*quoting Lovelace v. Lee*, 472 F.3d 174, 201 (4th Cir. 2006)).  In *Lovelace* the Fourth Circuit held that "simple negligence . . . does not suffice to meet the fault requirement under section 3 of RLUIPA" and admonishing that "[a]doption of the negligence standard would open prison officials to unprecedented liability for burdening an inmate's religious exercise." *Id*. at 194.

[23] The Court further notes that Plaintiff attaches to his Response a letter he wrote to CCA dated August 9, 2012. In the letter Plaintiff states: "In conjunction with Chaplain Michealson, the meals at the present time are adequate with no complaints from our Islamic community." *See* Correspondence [Doc. No. 72-3] at p. 2.

it may concern" correspondence addressed to CCA and dated August 9, 2012. *See* Correspondence [Doc. No. 72-3].[24] No reference is made to issues related to the wearing of religious gear in Plaintiff's correspondence.

Notably absent from Plaintiff's response is that he fails to identify any policy or custom implement by CCA that prohibited him from wearing a kufi. Defendants, however, have included as part of their summary judgment submissions the CCA policy regarding religious items like the kufi. *See* CCA Policy 20-4.1, Chaplaincy and Religious Services [Doc. No. 60-9]. Other than to include this policy as an exhibit, Defendants have not addressed the policy in their summary judgment briefing. Nonetheless, as pertinent here, the CCA policy states: "Inmates may request religious clothing . . . by completing and submitting a 20-4A Religious Article Authorization Request to the Chaplain." *Id*., ¶ 20-4.4(E). The record is silent as to whether Plaintiff ever submitted such a request.

The summary judgment record further shows that under the CDCR's regulations, religious articles could be worn, but only with the prior approval of the facility's warden. The record reflects NFCF followed this directive and the grievance record shows that during the time period relevant to Plaintiff's claims, the warden did not approve the wearing of a kufi at any time other than during religious services. *See* Grievance No. NF-11-05-001, First Level Appeal Response [Doc. No. 60-7], at pp. 9-10. [25]

---

[24] There is no evidence demonstrating this letter was ever mailed to, or received by, CCA.

[25] Plaintiff completed the grievance process as to this claim on December 13, 2011. *See* Third Level Appeal Decision [Doc. No. 60-7] at pp. 13-14. The CDCR denied the grievance based on its own regulations. *See id*. (*citing* Cal. Code Regs., § 3213(a)(3) (setting forth requirement that "[p]rior written approval of the institution head . . . [f]or an inmate to wear . . . an approved religious artifact at any time other than during their religious or sect events, or facility approved special events")).
. . . cont'd . . .

Plaintiff has not brought any claims against the CDCR in this action. And the grievance record shows that Plaintiff was not allowed to wear the kufi at all times based on the CDCR policy, not any policy of CCA.[26] Because Plaintiff's only potentially viable RLUIPA claim that remains in this action is a claim for money damages against CCA, Plaintiff's RLUIPA claim must be denied. To the extent the warden at NFCF made the decision that kufis could only be worn in the chapel, CCA is not liable under a theory of respondeat superior for any acts of the warden. But even assuming CCA could be liable for money damages for enforcing the CDCR policy or as the employer of the warden, the Court finds, for the reasons that follow that Plaintiff has failed to meet his burden of proof.

Plaintiff's claim that the inability to wear the kufi at all times substantially burdens his religious exercise is wholly conclusory. Plaintiff never states -- in the Complaint or in response to Defendants' summary judgment motion -- *why* or *how* the inability to wear the kufi *at all times* is a substantial burden on his religious exercise.

The Court recognizes that RLUIPA "is 'not limited to beliefs which are shared by all of the members of a religious sect.'" *Holt*, 135 S.Ct. at 863 (*quoting Thomas v. Review Bd. of Indiana Emp't Sec. Div.*, 450 U.S. 707, 715-16 (1981)). And the Court also recognizes that

---

[26] Plaintiff has attached a temporally irrelevant memorandum that suggests CDCR now allows inmates to wear religious headgear at all times. *See* Response, Memorandum [Doc. No. 72-12]. The Memorandum is undated but references action taken by the Office of Administrative Law on December 10, 2013. The Memorandum provides "[e]ffective immediately, inmates shall be permitted to wear approved religious headgear (as specified by the [Religious Personal Property Matrix]) throughout an institution." *Id.* CDCR is not a party to this litigation. Moreover, assuming a kufi falls within the definition of "approved religious headgear" any claim based on the Memorandum is unexhausted. Plaintiff's grievance of the kufi issue pre-dates the Memorandum and there is no evidence he sought administrative relief based on the Memorandum. *See generally Ross v. County of Bernalillo*, 365 F.3d 1181, 1188 (10th Cir. 2004) (a grievance "cannot exhaust administrative remedies for claims based on events that have not yet occurred"), *overruled on other grounds by Jones*, 549 U.S. at 223.

RLUIPA protection applies to an exercise of religion whether that exercise is compelled or not. *Holt*, 135 S.Ct. at 862; *see also* 42 U.S.C. § 2000cc-5(7)(A).

But without some facts to demonstrate why the kufi must be worn at all times, Plaintiff's request is indistinguishable from a prisoner's non-religious-based request to wear an article of clothing. Plaintiff attaches affidavits of Muslim prisoners at NFCF who allege that prisoners at NFCF can wear baseball hats and, therefore, they should be able to wear a kufi. Equating the kufi to baseball caps demonstrates a lack of connection between the kufi and a religious exercise. Like Plaintiff's allegations, the statements in the affidavit are conclusory and divorced from any religious context. *See* Response, Affidavits [Doc. No. 72-8] at p 2 (prisoner Watts); p. 4 (prisoner O'Neal) and p. 5 (prisoner Hightower).[27]

"Without some religious framework, claims such as [Plaintiff's] would open the door to finding that any inmate's assertion constitutes a sincerely held religious belief and that any limitation on that belief constitutes a substantial burden on the practice of his religion." *McFaul v. Valenzuela*, 684 F.3d 564, 577 (5th Cir. 2012); *see id.* at 577 (affirming dismissal of RLUIPA claim where prisoner provided, at best "mixed evidence regarding the centrality of onyx and prayer beads" to his religious exercise); *see also Little Sisters of the Poor Home for the Aged, Denver, Colorado v. Burwell*, 794 F.3d 1151, 1176 (10th Cir.) (addressing RFRA and stating that "accepting any burden alleged by Plaintiffs as 'substantial' would improperly conflate the determination that a religious belief is sincerely held with the determination that a law or policy

---

[27] The significance of the fact that inmates at NFCF are permitted to wear baseball caps speaks more directly to whether the denial of the right to wear kufis at all times is in furtherance of a compelling governmental interest. Defendants bear the burden of proof on that issue. However, no burden-shifting to Defendants is necessary here as Plaintiff has not met his initial burden of demonstrating a substantial burden on his religious exercise.

substantially burdens religious exercise"), *cert. granted in part*, -- U.S. --, 136 S.Ct. 446 (2015).[28]

The mere fact that Plaintiff wants to wear the kufi is insufficient to establish a substantial burden on his religious exercise. *See Little Sisters*, 794 F.3d at 1176 ("If plaintiffs could assert and establish that a burden is 'substantial' without any possibility of judicial scrutiny, the word 'substantial' would become wholly devoid of independent meaning."). Indeed, there is no evidence in the summary judgment record to demonstrate that Defendants' actions "put[ ] substantial pressure on [plaintiff] to modify his behavior and violate his beliefs," *Thomas*, 450 U.S. at 717–18, or forced Plaintiff to choose between the precepts of his religion and prison benefits. *Holt*, 135 S.Ct. at 862. Other courts have similarly found that a prisoner's failure to offer any evidence "that being allowed to wear a kufi only during religious activities, as opposed to wearing it all the time" substantially burdened his religious exercise is fatal to a RLUIPA

---

[28] In *McFaul*, that record at least included evidence that the prisoner needed prayer beads to help him concentrate during his prayers and that without the onyx he could not fully invoke certain rituals. *See id.* at 576. But the Fifth Circuit deemed this evidence showed at best an interference with his religious exercise, not a substantial burden. *Id.* In contrast, on the present record, there is no evidence whatsoever as to why Plaintiff must wear the kufi. Other courts to examine whether a burden is substantial have addressed the presence of facts connecting the practice at issue to the claimant's religious beliefs. *See, e.g., Yellowbear*, 741 F.3d at 56 (claimant explained that purpose of religious exercise of access to a sweat lodge is to "cleanse and purify our mind, our spirit, and our bodies . . . upon leaving it is said that you are born again physically and spiritually") (internal quotations omitted); *Ali v. Stephens*, 69 F. Supp.3d 633, 637 (E.D. Texas 2014) (summary judgment record included evidence that the plaintiff followed the Hanafi school of Islam; that "some Hanafi scholars believe it is a recommended act of piety to wear a Kufi at all times, which will be rewarded by God"; and that the plaintiff had been advised by an Islamic scholar that he has an obligation to wear a kufi at all times).

claim. *See, e.g., Junaid v. Kempker*, No. 4:04CV57-CDP, 2009 WL 881311 at * 8 (E.D. Mo. March 27, 2009) (unpublished op.) (citation omitted).[29]

Because the record is silent as to why the kufi is necessary, there are no facts upon which the Court can make a substantiality determination. Plaintiff has not adduced competent record evidence sufficient to raise a genuine issue of material fact that Defendants imposed a substantial burden on the exercise of his religion and Defendants are entitled to judgment as a matter of law in their favor.

### C. Other Religious Practices (Defendants CCA and Yates)

Plaintiff additionally brings a RLUIPA claim based on the following: (1) Plaintiff was "having issues getting copies made for religious services;" (2) Plaintiff was denied the right to purchase a printer in order to make copies; (3) Muslims were not allowed access to a religious channel; and (4) Muslims were allowed only two days per week in the chapel while Christians were allowed seven days per week. *See* Complaint at pp. 4-5.

In response to Plaintiff's grievance submitted on this issue, Plaintiff was advised that no funds exist for purchasing publications or making copies of religious materials and that any copies made for other faiths are "donated by outside ministries." *See* Defendants' Motion, Grievance Records [Doc. No. 60-4] at p. 3. Plaintiff was further advised that "[s]ome of the Religious T.V. stations come with the cable package" and that "Religious Channels 45 & 46 are sponsored, maintained, and paid for by the 7th Day Adventist Ministries." *Id.* Finally, Plaintiff was advised that NFCF provides two Muslim services per week and that this was "[a]dequate

---

[29] There is at least some support for the notion that wearing a kufi is of cultural, not religious significance. *See, e.g., Caruso v. Zenon*, No. 95-MK-1578 (BNB), 2005 WL 5957978 at *6 (D. Colo. July 25, 2005) (addressing conflicting expert testimony on this issue). Regardless, Plaintiff's claim is unsupported, wholly conclusory and, therefore, insufficient to demonstrate any genuine issue of material fact exists.

time" as there is "not enough time on the Religious Calendar" to accommodate extra time for all services. *Id.*

In moving for summary judgment, Defendants refer to the grievance response. In addition, Defendants attach the schedule of religious services for the years 2011 and 2012. *See* Motion at pp. 34-36; *see also* NFCF Religious Programs Schedule [Doc. No. 60-11]. Defendants also submit the affidavit of the chaplain at NFCF, John DeWayne Wright [Doc. No. 60-12] (Wright Affidavit). Chaplain Wright addresses the variety of faith groups requesting use of the facility's chapel each week, the fact that Muslim services are scheduled two times per week, his understanding that the prison policy does not permit, nor would it be feasible, to allow Plaintiff to have his own photocopier, that inmates are not permitted free copies of religious materials but that he does try to accommodate requests when possible, and that no Muslim religious programming is offered as part of the cable television package offered in the surrounding community. *See* Wright Affidavit, ¶¶ 1-10. He also states that he does not recall Plaintiff "having re-occurring problems related to religious matters while he was confined at [NFCF]." *See id.*, ¶ 14. Defendants contend Plaintiff has failed to establish a substantial burden on his religious exercise as required to support a claim under RLUIPA.

In response, Plaintiff relies on affidavits of Muslim prisoners confined at NFCF who repeat the same allegations as set forth in Plaintiff's Complaint. *See, e.g.*, Statement of Yahya O'Neal [Doc. No. 72-8] (Muslims are "not allowed to get religious copies," had "problems getting donated material" and were "only given two days a week while the Christians had 7 days a week for the chapel"); Statement of Carey Hightower [Doc. No. 72-8] (same).

As with Plaintiff's claim concerning the right to wear a kufi, the summary judgment record contains no facts demonstrating why or how the denial of the requested copies, access to a

copy machine or access to a Muslim television channel substantially burdens Plaintiff's religious exercise. In this regard, "RLUIPA does not oblige a government to affirmatively subsidize religion." *Abdulhaseeb*, 600 F.3d at 1321 (finding that private prison was not required to provide a full-time paid Muslim spiritual leader). Similarly, Plaintiff does not demonstrate why the failure to provide more than two services per week to Muslim prisoners substantially burdens his religious exercise. *Compare Abdulhaseeb*, 600 F.3d at 1321 (although prisoner listed "several benefits to him from participating in an Islamic revival" no evidence showed that that "the defendants' failure to host a revival substantially burdened his religious exercise").

Plaintiff has failed to allege specific facts demonstrating any triable issues of fact as to any substantial burden placed upon his religious exercise by Defendants. And, again, Plaintiff has failed to identify a policy or custom of CCA that substantially burdened his religious practice. Plaintiff's conclusory allegations are insufficient at the summary judgment stage. Defendants, therefore, are entitled to judgment as a matter of law in their favor.

In sum, Plaintiff has not met his burden of proof as to any claims brought under RLUIPA. Accordingly, the Court need not address evidence submitted by Defendants to demonstrate that any burden on Plaintiff's religious exercise is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest. *See Holt*, 135 S.Ct. at 863 (*citing* 42 U.S.C. § 2000cc-1(a)); *see also Pfeil v. Lampert*, 11 F. Supp.3d 1099, 1110 (D. Wyo. 2014) (for purposes of either a Free Exercise Clause claim or RLUIPA claims, if a plaintiff fails to meet his burden of establishing his sincerely held religious belief has been substantially burdened, "the court need not examine the claim further because the [p]laintiff is unable to prevail without showing a substantial burden") (citation omitted).

### C.    Section 1983 Claims

Plaintiff's claims brought pursuant to § 1983 allege: (1) a violation of his equal protection rights under the Fourteenth Amendment based on Christian prisoners receiving more preferential treatment than Muslim prisoners; (2) a violation of his Eighth Amendment rights due to unconstitutional conditions of confinement concerning heating and plumbing issues encountered in his cell; and (3) damage to his property in violation of his Fourteenth Amendment rights.[30]

To establish liability under § 1983, a plaintiff must show a defendant's direct participation in the violation of a federal statutory or constitutional right. *See Henry v. Storey*, 658 F.3d 1235, 1241 (10th Cir. 2011) (allegations of "personal participation in the specific constitutional violation complained of [are] essential"). To establish personal participation, there must be an affirmative link between the alleged constitutional violation and each defendant's participation, control or direction, or failure to supervise. *See Butler v. City of Norman*, 992 F.2d

---

[30] Notably, Plaintiff does not bring a § 1983 claim alleging a violation of his free exercise rights under the First Amendment based on any of the facts that support his RLUIPA claim. Instead, the face of the Complaint alleges only a violation of his rights under RLUIPA. *See* Complaint at p. 6 (expressly referencing under the heading "Legal Claims" RLUIPA and the Eighth and Fourteenth Amendments but making no reference to the First Amendment). In moving for summary judgment, Defendants address Plaintiff's failure to allege any violation of his First Amendment rights. *See* Motion at p. 27 ("Despite his numerous allegations of having been denied religious freedoms, Plaintiff has not pled a cause of action under the First Amendment. Instead, Plaintiff alleges Defendants violated RLUIPA by not correcting religious diet issues and non-diet religious issues."). In his Response, Plaintiff does not challenge Defendants' assertion as to the construction of the claims raised in the Complaint. The Court agrees with Defendants' construction and, therefore, limits its review of the summary judgment record to claims under RLUIPA. Although Plaintiff's pro se status entitles him to a liberal reading of his pleadings, the Court will not serve as his advocate. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). But even if Plaintiff had asserted a violation of his First Amendment rights, as discussed in the context of Plaintiff's RLUIPA claims, he has not shown a substantial burden on his religious exercise and necessarily, therefore, any § 1983 claims under the First Amendment would fail. *See Kay*, 500 F.3d at 1218 (to allege a constitutional violation under the Free Exercise Clause, the prisoner must show that a prison regulation substantially burdened sincerely held religious beliefs).

1053, 1055 (10th Cir. 1993). When a plaintiff brings § 1983 claims against a supervisor, the plaintiff must allege facts to show the supervisor was personally involved in the deprivation of constitutional rights; vicarious liability under a theory of respondeat superior does not exist under § 1983. *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 767 (10th Cir. 2013).[31]

### 1. Denial of Grievances/Interference with Grievance Process (Defendant Barton)

Plaintiff's only allegations against Defendant Barton relate to his denial of Plaintiff's grievances and/or his interference with Plaintiff's attempts to exhaust administrative remedies. *See* Complaint at pp. 2, 6. The summary judgment record similarly reflects the only basis for Plaintiff's claims against Defendant Barton are based on his role as Grievance Coordinator and his conduct in processing Plaintiff's grievances. Defendants seek summary judgment on this claim on behalf of all Defendants. *See* Defendants' Motion at pp. 44-45.

Under well-established law "a denial of a grievance, by itself without any connection to the violation of constitutional rights alleged by plaintiff, does not establish personal participation under § 1983." *Gallagher*, 587 F.3d at 1069. Thus, Defendants are entitled to judgment as a matter of law as to any claims by Plaintiff alleging a violation of his constitutional rights based on the denial of grievances and/or interference with the grievance process.

### 2. Equal Protection Claims (Defendants CCA and Yates)

Plaintiff alleges a violation of his equal protection rights based on alleged differential treatment of Christian prisoners and Muslim prisoners. He relies on the same facts as those

---

[31] For purposes of Plaintiff's § 1983 claims, Defendants do not claim that a private prison or its employees are not state actors and therefore, the Court assumes for purposes of its analysis that the state action requirement is satisfied. *See, e.g., Craft v. Middleton*, 524 F. App'x 395, 397 n. 3 (10th Cir. 2013) (citing cases).

alleged in support of his RLUIPA claim, i.e, (1) Plaintiff was "having issues getting copies made for religious services;" (2) Plaintiff was denied the right to purchase a printer in order to make copies; (3) Muslims were not allowed access to a religious channel; and (4) Muslims were allowed only two days per week in the chapel while Christians were allowed seven days per week. *See* Complaint at pp. 4-5.[32]

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To that end, the Equal Protection Clause provides that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Although equal protection requires reasonable opportunities for all inmates to exercise their religious beliefs, it does not require that all religions receive identical treatment and resources. *Cruz v. Beto*, 405 U.S. 319, 322 n. 2. (1972) ("A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand. But reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty."). Instead, the Supreme Court has made clear that it is constitutionally sufficient in the prison context for prison officials to provide inmates belonging to various

---

[32] Defendants have not expressly moved for summary judgment on Plaintiff's § 1983 claim alleging a violation of his equal protection rights. But the identical facts addressed in the context of Plaintiff's RLUIPA claim serve as the basis for Plaintiff's § 1983 claim. Because the record before the Court does not support a violation of Plaintiff's equal protection rights, it is recommended that summary judgment be granted to Defendants as to this claim. *See* Fed. R. Civ. P. 56(f)(2) (providing that upon notice and a reasonable time to respond the court may grant summary judgment "on grounds not raised by a party"). Plaintiff will be allowed the opportunity to object to this Report and Recommendation and present any additional facts that may support such a claim. Therefore, Plaintiff would not be prejudiced by the entry of judgment in favor of Defendants on this claim. For the reasons discussed *infra*, absent presentment of any additional facts, the record before the Court does not support such a claim.

religions a "reasonable opportunity," consistent with valid penological concerns, to practice their religion, and that this opportunity must be "comparable" to the opportunities afforded inmates belonging to mainstream religions. *Cruz*, 405 U.S. at 322. Moreover, in order to establish an equal protection violation, Plaintiff must show a discriminatory purpose leading to disparate treatment. *See, e.g., Personnel Administrator of Massachusetts v. Feeny*, 442 U.S. 256, 279 (1979). "'Discriminatory purpose' implies more than intent as volition or intent as awareness of consequences . . . . It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' and not merely 'in spite of,' its adverse effects on an identifiable group." *Id*. at 279 (citations omitted).

As set forth in relation to Plaintiff's RLUIPA claim, the evidence shows no outright denial of copies of religious materials to Muslims. Nor has Plaintiff submitted any evidence, other than his own conclusory allegations, that Christians are treated more favorably with respect to copies. Defendants have submitted the affidavit of DeWayne Wright, the Chaplain at NFCF, who states that he approves most requests for copies of religious materials and that he must always keep in mind the need to be "fair and balanced" in accommodating such requests. *See* Affidavit of DeWayne Wright [Doc. No. 60-12] (Wright Affidavit) at ¶ 9. Additionally, as set forth above, the grievance response indicates that copies made on behalf of other religions are paid for by community resources outside the prison.

Plaintiff does not allege that any other faith group is allowed to have its own printer, thus Plaintiff cannot establish any disparate treatment as a result of the denial of his request to purchase a copier. As set forth in the Wright Affidavit, printers are not an approved item prisoners may have at NFCF and other practical concerns would prohibit accommodating such a request. *See* Wright Affidavit, ¶ 8.

As to cable television, Chaplain Wright states that Muslim programming is not offered through the cable television packages available to the prison and in the surrounding community of Sayre Oklahoma. *See* Wright Affidavit, ¶ 10. In addition, the grievance record indicates that "[s]ome of the Religious T.V. stations come with the cable package" and that "Religious Channels 45 & 46 are sponsored, maintained and paid for by the 7th Day Adventist Ministries." *See* Grievance No. NF-11-05-001 [Doc. No. 60-4] at p. 3. Thus it appears that any religious programming that is made available is sponsored by resources outside the prison and not the result of any conduct by prison officials.

Finally, the chapel time provided to Muslims is comparable to that provided other religious groups. A review of the religious schedule submitted by Defendants, together with the Affidavit of Chaplain Wright, demonstrate the large array of religious practices that are accommodated at NFCF. Contrary to Plaintiff's allegations, the services are not divided simply between "Christian" and Muslim faiths but include a wide variety of practices the prison accommodates, such as Buddhist practices, Wiccan practices and Native American practices. As set forth in Chaplain Wright's affidavit, "[g]iven the number of faith groups and religions at the prison facility, [NFCF] ha[s] structured the scheduling and use of the Chapel to reasonably try to meet the needs of all" and that "the faith groups that are regularly using the Chapel are satisfied with the schedule [NFCF] ha[s] developed and they work well together in order for all to have a reasonable amount of time." *See* Wright Affidavit, ¶ 7; *see also* NFCF Religious Programs Schedules [Doc. No. 60-11].[33]

---

[33] The Court notes that Plaintiff initiated his grievance as to this issue in May 2011. *See* Grievance Record [Doc. No. 60-7] at p. 4. The Religious Programs Schedule for the calendar year 2011 shows that Muslim services were provided on a regular basis every Friday (Jumah Prayer) and Saturday (Taleem) throughout that year. But the same schedule for the calendar year
. . . cont'd . . .

The summary judgment record does not show that any prison official treated Muslim prisoners at NFCF less favorably than prisoners of other faith groups or acted with any discriminatory purpose. In addition, Plaintiff has not identified any policy or custom implemented at NFCF to support an equal protection claim against Defendant CCA. To the contrary, Plaintiff makes only unsupported allegations of unequal treatment and/or improper intent, leaving his § 1983 claim deficient. For all these reasons, Plaintiff has failed to establish a violation of his equal protection rights. Defendants, therefore, are entitled to judgment as a matter of law in their favor as to these claims.

### 3. Eighth Amendment Claims (Defendants CCA and Yates)

Plaintiff brings claims under § 1983 alleging unconstitutional conditions of confinement in violation of his Eighth Amendment rights. Plaintiff's claims are premised on alleged heating and plumbing issues related to his cell for a time period during December 2011 and January 2012.

The Eighth Amendment requires prison officials "to provide humane conditions of confinement by ensuring inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and by taking reasonable measures to guarantee the inmates' safety." *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998). But "only those deprivations denying the minimal civilized measure of life's necessities . . . are sufficiently grave to form the basis of an

---

2012 shows the services were provided on a sporadic basis and there is no explanation in the summary judgment record as to the reasons for such sporadic offerings. Nonetheless, Plaintiff's claim is not based on any denial of services in 2012. Instead, Plaintiff's claim is based on allegations that Christians were allowed use of the chapel for religious services seven days per week and Muslims were allowed use of the chapel only two days per week. Moreover, Plaintiff did not submit any grievances related to issues occurring in 2012. For this reason, the Court deems the Religious Programs Schedule for 2012 not material to the disposition of Plaintiff's claim.

Eighth Amendment violation." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (internal quotations omitted).

To establish a prison official's liability for inhumane conditions of confinement, both an objective and subjective component must be satisfied. The deprivation alleged must be "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) ("the inmate must show that he [was] incarcerated under conditions posing a substantial risk of serious harm"). And, the prison official must have acted with a "sufficiently culpable state of mind," i.e., the official must have acted with deliberate indifference to a substantial risk of serious harm to the prisoner. *Id*. As to the objective component, whether prison conditions constitute cruel and unusual punishment for Eighth Amendment purposes depends on whether those conditions are sufficiently prolonged and severe. *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998). "The purpose of the 'sufficiently serious' requirement 'is to limit claims to significant, as opposed to trivial, suffering. Consequently, [the court] look[s] to the alleged injury claimed by the prisoner, and asks[s] whether that harm is sufficiently serious.'" *Murray v. Edwards County Sheriff's Dept.*, 248 F. App'x 993, 997 (10th Cir. 2007) (*quoting Kikumura v. Osagie*, 461 F.3d 1269, 1291 (10th Cir. 2006)). Finally, the Constitution "does not mandate comfortable prisons" and jail conditions may be "restrictive and even harsh" without violating constitutional rights. *Rhodes v. Chapman*, 452 U.S. 337, 347, 349 (1981).

### a.    Alleged Failure to Maintain Proper Heating of Plaintiff's Cell

Plaintiff alleges in the Complaint that for a period of approximately one month, from December 18, 2011 through January 12, 2012, prison officials did not complete maintenance work on the system heating his cell and that as a result, cold air was blowing through the system at "full blast." *See* Complaint at p. 5.  He also claims "the staff" would not give him an extra blanket or more clothes as requested during this time.  Plaintiff alleges "the warden was aware of this issue and didn't rush them to get the work done." Plaintiff identifies the "head of maintenance" as the prison official responsible for not fixing the heating and plumbing.  *See id.* at p. 6.

In moving for summary judgment, Defendants rely on the grievance investigation of this matter along with the Affidavit of Nick Kerr [Doc. No. 60-13] (Kerr Affidavit), the current maintenance supervisor at NFCF.  Mr. Kerr first explains that each cell does not have its own individual heating unit but, instead, several large heating/cooling units operate the entire housing unit.  *See* Kerr Affidavit, ¶ 2.  He then states that he has reviewed the maintenance records for housing unit H, where Plaintiff resided, for the time period late December 2011 through early January 2012 and that "[t]here is no record of a heating system failure" or "even of a maintenance repair issued by the maintenance department" for housing unit H indicating that "service of the heating system for the 'H' housing unit was not required during that time period." *See id.*, ¶ 3.  He further states that had a repair order issued, it "would have been considered to be a high priority service."  *Id*.

Mr. Kerr further states that the thermostats are "centrally controlled by the maintenance department" and "are operationally maintained during the cooler weather within a range of 68°F

to 70°F." *Id*. Finally, he states that "[t]he heating units and their operational temperatures are regularly checked by the maintenance staff." *Id*.

The grievance records indicate that a maintenance order was submitted and that in response, a technician reported that the system was in working order and that the thermostats were set at 68 degrees for heat and 74 degrees for air conditioning. *See* Grievance Records [Doc. No. 60-6] at pp. 3-11. Because the system was in working order and the thermostats set appropriately, Plaintiff's request for additional clothing was denied. *See id*. at p. 3.

In his Response, Plaintiff relies on the same grievance submissions and further attaches a copy of a work order dated January 13, 2012 to address the issue of cold air blowing in Plaintiff's cell. *See* Plaintiff's Response, Grievances [Doc. No. 72-10] at pp. 5-12 and Work Order [Doc. No. 72-10] at pp. 1-2.[34] Plaintiff states that he "sat in a cold cell with no heat while it was snowing outside without any extra blankets or extra clothes." *See* Response at p. 5.

Plaintiff does not refute any of the evidence submitted by Defendants regarding the temperatures maintained in his cell during the relevant time period. And, although Plaintiff was denied a request for an *extra* blanket or *additional* clothing, there are no facts to suggest he did not have adequate clothing or a blanket in his cell. The conditions about which Plaintiff complains do not, on the summary judgment record, objectively demonstrate a sufficiently serious risk of harm so as to give rise to an Eighth Amendment violation. *Compare Skelton v. Bruce*, 409 F. App'x 199, 204 (10th Cir. 2010) (agreeing with the Seventh Circuit "that the fact that inmates need to bundle up in a coat and blanket does not necessarily mean that the prison conditions are unconstitutional" but declining to decide whether temperature set at 68 degrees

---

[34] Although not expressly stated by Plaintiff, it appears the Work Order was produced during the discovery phase of this action as the document is marked with a date of June 19, 2014 and bates number – 000065. *See* Work Order [Doc. No. 72-10] at p. 1.

satisfied the objective component of an Eighth Amendment claim) (*citing Dixon v. Godinez*, 114 F.3d 640, 644 (7th Cir. 1997)).

But even assuming, like the Tenth Circuit in *Skelton*, that Plaintiff's statements about the conditions he encountered might satisfy the objective component, the factual record demonstrates no deliberate indifference by any prison official. Indeed, the record shows that Plaintiff's complaint was responded to and maintenance was sent to investigate the issue. *See Skelton*, 409 F. App'x at 204-205 (finding no deliberate indifference where the defendant responded to the prisoner's grievance by "checking the temperature with maintenance and confirming that the heater had been set to 68 degree" and recognizing that "[w]hile . . . Mr. Skelton complains of nighttime temperature drops and that a single temperature check was performed during the day, [the court] will not hold prison officials liable for what would at most amount to mere negligence"). On the record presented, therefore, Plaintiff's Eighth Amendment claim arising from his complaints about inadequate heat in his cell lacks merit. Significantly, Plaintiff fails to demonstrate that any Defendants, and in particular, Defendants CCA or Yates against whom Plaintiff brings his claims, personally participated in the alleged deprivation of his constitutional rights. For all of these reasons Defendants are entitled to judgment as a matter of law on Plaintiff's Eighth Amendment claim related to the alleged inadequate heating of his cell.

### b.     Alleged Problems with the Plumbing in Plaintiff's Cell (Defendants CCA and Yates)

Plaintiff also brings a claim of unconstitutional conditions of confinement based on alleged problems with the plumbing in his cell. According to the allegations of the Complaint, the plumbing problems existed for a period of approximately four days, from December 31, 2011 through January 3, 2012. *See* Complaint at p. 5. Plaintiff alleges that he called maintenance but no one came to address the problems. *Id*. He further alleges that his cell flooded and his college

books and tapes were "messed up." *Id.* He claims that for a period of time while he waited for maintenance to fix the problem, the water to his cell had to be "cut off and on by the guard from the outside because if it stayed on it would not cut off." *Id.*

Defendants contend that no evidence supports Plaintiff's claim that there was a water leak in his cell and/or that Plaintiff reported any leak to maintenance personnel at NFCF. *See* Defendants' Motion at pp. 39, 41. Defendants rely on statements set forth in the Kerr Affidavit. Mr. Kerr states that he has reviewed the maintenance records relative to the alleged water leak *on December 29, 2011* and that "[t]here is no record of a water leak and/or plumbing problem for [Plaintiff's] cell in the 'H' inmate housing unit for that time period." *See* Kerr Affidavit, ¶ 4 (emphasis added). He further states that maintenance work orders are submitted by prison staff and that "generally the submitted work orders are worked by us within the time period of the shift on duty at the time of submission." *See id.*

But Plaintiff alleges the water leak occurred on December 31, 2011. And in responding to Defendants' Motion, he includes his grievance submissions on this issue which likewise reflect the leak occurred on December 31, 2011. *See* Form 602 [Doc. No. 72-10] at pp. 11-14; *see also* Form 22 [Doc. No. 72-10] at p. 15. Thus, Mr. Kerr's statements are not relevant as they do not address the proper time period at issue.

Plaintiff also attaches photographs that purport to be taken of his cell during the relevant time period and show standing water on the floor. [35] In addition, he attaches a work order dated January 1, 2012 for a clogged sink in "HC 105" – the same cell identified as Plaintiff's cell in his

---

[35] Again, although not expressly stated by Plaintiff, it appears these photographs were produced during the discovery phase of this action as the photographs are marked with a date of October 16, 2014 and bates numbers – 000085-86. *See* Photographs [Doc. No. 72-7].

grievance submissions. *See* Work Order [Doc. No. 72-10] at p. 3; *see also* Form 22 [Doc. No. 72-10] at p. 10 (identifying Plaintiff's Housing/Bed Number as HC-105).[36]

The undisputed factual record shows that Plaintiff's cell was flooded as a result of a plumbing problem on or about January 1, 2012. But the record does not support an Eighth Amendment claim of unconstitutional conditions of confinement. Plaintiff acknowledges that he was given a mop to clean up the standing water. *See* Complaint at p. 5 ("The night officer woke me up and gave me a mop to clean up the mess."). And he does not identify any substantial harm he suffered as a result of either the initial flooding of his cell or the fact the water to his cell had to be turned off and on for a period of a few days until the plumbing problem was remedied. *Compare Custard v. Armijo*, No. 15-cv-00448-GPG, 2015 WL 2407103 at *4 (D. Colo. May 19, 2015) (unpublished op.) (citing cases from "[o]ther district courts recogniz[ing] that confining a prisoner to a flooded cell for a brief period of time does not violate the Eighth Amendment, especially where there is no allegation that the flooding involved human waste.") (internal quotations and citations omitted). The record, therefore, fails to demonstrate a sufficiently serious risk of harm to support an Eighth Amendment claim. Nor has Plaintiff identified any personal participation by any moving Defendant in the alleged unconstitutional conditions of his confinement. *See, e.g., DeSpain v. Uphoff*, 264 F.3d 965, 975 (10th Cir. 2001) (A prison official who is not aware of the challenged conditions "'cannot be said to have inflicted punishment' in a manner that violates the Eighth Amendment.") (*quoting Farmer*, 511 U.S. at 844).

---

[36] The Work Order also appears to have been produced during discovery as it is similarly marked with a date of June 19, 2014 and bates number – 000067. *See* Work Order [Doc. No. 72-10] at p. 3.

In sum, the undisputed factual record fails to support a violation of Plaintiff's Eighth Amendment rights based on heating or plumbing problems affecting his cell. Defendants, therefore, are entitled to judgment as a matter of law in their favor.

As a final matter, the Court notes that both in the Complaint and in grievance submissions, Plaintiff alleges that property was damaged as a result of the plumbing issues and standing water in his cell. Specifically, he claims that his college books and some tapes were destroyed. It is not clear whether Plaintiff also asserts a violation of his Fourteenth Amendment due process rights as a result of the destruction of this property. But even if Plaintiff does bring such a claim it lacks merit. As discussed next in the context of Plaintiff's Fourteenth Amendment claims, to succeed, Plaintiff must demonstrate that post-deprivation remedies are not available for any such negligent destruction of his property. Plaintiff has failed to make this showing and has failed to identify any prison official responsible for the destruction of such property.

### 4. Destruction of Property/Due Process Rights (Defendants CCA, Yates, Findlay and Lacy)

Plaintiff alleges that when he arrived at NFCF and his property was inventoried on April 5, 2011, his television, radio and typewriter were broken. Plaintiff alleges the property was mishandled by NFCF. *See* Complaint at p. 4. According to Plaintiff, Defendants Findlay and Lacy (employees at NFCF) told him the property would be replaced. *Id.* He claims these same Defendants told him he did not need to submit a grievance, but out of caution, he did so. *Id.* He claims Defendant Barton interfered with his ability to grieve this issue. *Id* He further claims Defendant Figueroa, the warden, told Defendants Findlay and Lacy to replace his property. *Id.*[37]

---

[37] Defendant Figueroa is not one of the moving Defendants and as discussed *supra*, footnote 1, Plaintiff's claims against Defendant Figueroa are addressed in a separate Report and Recommendation.

As discussed above, Defendants move for summary judgment on this claim raising the affirmative defense of failure to exhaust administrative remedies. Alternatively, Defendants contend Plaintiff has failed to demonstrate a deprivation of his property in violation of his due process rights. Although, as set forth above, the Court has found Plaintiff did not exhaust administrative remedies as to this claim, the Court addresses Defendants' alternative argument that Plaintiff's claim should be denied on the merits.

Plaintiff's § 1983 claim is premised on an alleged deprivation of property without due process of law in violation of the Fourteenth Amendment. He alleges, at best, damage to his property as a result of a negligent act. Although an unauthorized, intentional deprivation of a prisoner's property is actionable under the Due Process Clause, neither negligent nor unauthorized deprivations of property by a prison official "constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post deprivation remedy for the loss is available."[38] *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); s*ee also Gillihan v. Shillinger*, 872 F.2d 935, 939 (10th Cir. 1989) ("neither negligent nor intentional deprivations of property under color of state law that are random and unauthorized give rise to a § 1983 claim where the plaintiff has an adequate state remedy), *abrogated on other grounds by Clark v. Wilson*, 625 F.3d 686, 691 (10th Cir. 2010); *see also Frazier v. Flores*, 571 F. App'x 673, 676 (10th Cir. 2014) (affirming dismissal of claim based on deprivation of property where plaintiff alleged only random and unauthorized acts by prison officials based on their "practice of arbitrarily seizing inmate's property with scant

_____

[38] An unauthorized deprivation is one carried out pursuant to established state procedures, regulations or statutes. *See, e.g., Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 435-36 (1982). The record contains no facts to demonstrate the damage to Plaintiff's property resulted from any established procedure, policy or regulation.

justification"); *Amin v. Voigtsberger*, 560 F. App'x 780, 785-86 (10th Cir. 2014) (affirming dismissal of prisoner's claim that property was stolen by prisoner officials when he was placed in segregation because adequate state post-deprivation remedies exist under Colorado law); *Harris v. Norvell*, No. 92-6185, 1992 WL 376119 at *2 (10th Cir. Dec. 11, 1992) (unpublished op.) (*accord*; finding adequate post-deprivation remedies under Oklahoma law) (*citing* Okla. Stat. tit. 12, § 1571 (replevin) and Okla. Stat. tit. 51, § 151-171 (Governmental Tort Claims Act)).

Moreover, the record is void of any facts addressing the inadequacy or unavailability of a post-deprivation remedy. *See Durre v. Dempsey*, 869 F.2d 543, 548 (10th Cir. 1989) (affirming dismissal of plaintiff's due process deprivation of property claim, stating that "[i]n order to state a claim under § 1983, a complaint must allege facts sufficient to show deprivation, in this case the lack of an adequate state remedy"); *Scott v. Case Manager Owens (SCF)*, 80 F. App'x 640, 643 (10th Cir. 2003) (a plaintiff must demonstrate that he does not have a "meaningful post-deprivation remedy, such as a state tort law action.") (*citing Hudson*, 468 U.S. at 533)). As the Tenth Circuit has recognized, "[t]he deprivation of procedural due process is not complete unless and until the state fails to provide adequate constitutionally essential procedures." *Winters v. Bd. of County Comm'rs*, 4 F.3d 848, 856 (10th Cir.1993).[39]

Finally, Plaintiff does not identify the person responsible for the damage to his property. Although he states that Defendants Lacy and Findlay inventoried his property and discovered the

---

[39] The Tenth Circuit has long-recognized that adequate post-deprivation remedies are available under Oklahoma law. *See, e.g., Harris*, 1992 WL 376119 at *2. To the extent the post-deprivation remedies are governed by either California law (because Plaintiff is a California prisoner) or Arizona law (because La Palma is located there and Petitioner was directed to grieve his claim at La Palma), the courts have held that adequate post-deprivation remedies exist under the laws of those states. *See, e.g., Barnett v. Centoni*, 31 F.3d 813, 816-17 (9th Cir. 1994) (*citing* Cal. Gov't. Code §§ 810-895); *Rooke v. Vail*, No. CV 11-0955-PHX-RCB(JRI), 2011 WL 3563148 at *4 (D. Ariz. Aug. 11, 2011) (unpublished op.) (citing relevant Arizona law).

damage, he does not allege that they caused the damage. Nor does he identify any other named Defendant as responsible for the damage to his property. Therefore, his claim must also be denied because he has not alleged the requisite personal participation of any named Defendant. *See Trujillo v. Williams*, 465 F.3d 1210, 1227 (10th Cir. 2006) ("In order for liability to arise under § 1983, a defendant's direct personal responsibility for the claimed deprivation of a constitutional right must be established.").

In sum, Plaintiff's claims premised on an alleged due process violation is unexhausted and summary judgment in favor of Defendants on this ground is proper. Alternatively, the undisputed factual record demonstrates that Defendants are entitled to judgment as a matter of law in their favor on Plaintiff's due process claims.

### 5.  Plaintiff's § 1983 Claims Against CCA

Defendant CCA additionally moves for summary judgment on grounds Plaintiff has failed to allege facts showing any wrongful conduct attributable to CCA. As set forth above, under Tenth Circuit law, to establish § 1983 liability against a private corporation Plaintiff must demonstrate that a policy, custom or practice of the corporation has resulted in the violation of his constitutional rights. *See* discussion, *supra*. The record is void of facts sufficient to demonstrate CCA's liability. Plaintiff has not identified any official policy, custom or practice as to any of the § 1983 claims brought against CCA. Accordingly, on this basis, CCA is further entitled to judgment as a matter of law in its favor as to Plaintiff's § 1983 claims.

### RECOMMENDATION

It is recommended that Plaintiff's claims for injunctive and declaratory relief be denied as moot. It is further recommended that Plaintiff's RLUIPA claims for monetary damages against the individual defendants be dismissed with prejudice pursuant to 28 U.S.C. §§1915(e)(2)(B)(ii)

and 1915A(b)(1) or that summary judgment be granted on these claims pursuant to Fed. R. Civ. P. 56(f). Finally it is recommended that the Motion for Summary Judgment and Brief in Support [Doc. No. 60] of Defendants Corrections Corporation of America, B. Barton, Sergeant Findlay, L. Lacy and J. Yates be granted as to all claims raised by Plaintiff in this action. Specifically, Defendants are entitled to judgment as a matter of law as to:

(1) Plaintiff's RLUIPA claims regarding his Halal diet (other than those arising from Grievance No. NF-12-11-004) pursuant to 42 U.S.C. § 1997e(a) for failure to exhaust administrative remedies;

(2) Plaintiff's § 1983 claims under the Due Process Clause of the Fourteenth Amendment alleging property damage to his television, radio and typewriter pursuant to 42 U.S.C. § 19997e(a) for failure to exhaust administrative remedies;

(3) Plaintiff's RLUIPA claims against Defendant CCA on grounds that Plaintiff has not demonstrated his rights have been violated as a result of a policy or custom of CCA or, alternatively, Plaintiff has not demonstrated a substantial burden on his religious exercise;

(4) Plaintiff's § 1983 claims against Defendant Barton (and any other Defendant) based on any alleged interference with the prison grievance process;

(5) Plaintiff's § 1983 claims alleging a violation of his equal protection rights under the Fourteenth Amendment;

(6) Plaintiff's § 1983 claims for violations of his Eighth Amendment rights; and

(7) Plaintiff's § 1983 claims for violations of his Fourteenth Amendment due process rights based on the alleged damage to his property.

## NOTICE OF RIGHT TO OBJECT

The parties are advised of their right to object to this Report and Recommendation. *See* 28 U.S.C. § 636. Any objection must be filed with the Clerk of the District Court by February 16, 2016. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). Failure to make timely objection to this Report and Recommendation waives the right to appellate review of the factual and legal issues addressed herein. *Moore v. United States*, 950 F.2d 656 (10th Cir. 1991).

## STATUS OF REFERRAL

In conjunction with the Report and Recommendation of Dismissal Without Prejudice of Plaintiff's Claims Against Certain Defendants filed on this same date, this Report and Recommendation terminates the referral by the District Judge in this matter.

ENTERED this 26th day of January, 2016.

BERNARD M. JONES
UNITED STATES MAGISTRATE JUDGE